**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VICKIE M. LYONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 06 C 6257** |
| **v.** | ) | |
| | ) | **Mag. Judge Michael T. Mason** |
| **MICHAEL J. ASTRUE** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Vickie M. Lyons ("Lyons" or "claimant") filed a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits. The Commissioner filed a cross-motion for summary judgment, asking this Court to uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Lyons' motion is granted in part, the Commissioner's motion is denied, and this case is remanded for further proceedings consistent with this opinion.

**I.     PROCEDURAL HISTORY**

Lyons filed an application for disability insurance benefits on August 28, 2003. (R. 17). She alleged a disability onset date of July 3, 2003 primarily due to lupus, arthritis and back pain. (R. 17, 44). The Commissioner denied Lyons' application initially and again on reconsideration. (R. 40-44, 50-52). Lyons filed a timely request for a hearing, which was held on March 3, 2006 before ALJ Robert Senander ("ALJ

Senander"). (R. 55, 254-281). ALJ Senander issued a written decision denying Lyons' claim for benefits on March 14, 2006. (R. 17-23). The Appeals Council subsequently denied Lyons' request for review, and ALJ Senander's decision became the final decision of the Commissioner. (R. 9-11); *Zurawski v. Halter,* 245 F.3d 881, 883 (7th Cir. 2001).

## II.   FACTUAL BACKGROUND

### A.   Claimant's Testimony

Lyons was born on March 14, 1973. (R. 257). At the March 3, 2006 hearing, Lyons testified that she was single and living in a house with her mother and two sons, ages eight and twelve. (R. 258). Lyons completed two years of college. (R. 259). She has not received any vocational training and has never been in the military. (*Id.*). Lyons is 5'8'' and, as of March 2006, weighted approximately 200 pounds. (R. 257).

Starting in 1992, claimant worked for approximately two years as a cashier at Carson's department store. (R. 262). This job required Lyons to "just walk around, stand," stock clothes onto sales racks, lift racks of clothes, and do inventory once per year. (*Id.*). When asked if the cashier position required lifting more than twenty pounds, claimant responded: "I believe so. It was a long time ago. I really don't remember." (*Id.*). Lyons later clarified that she "think[s] it was more than 20 pounds." (R. 263). Claimant also worked as a photographer for five or six months in 1994 "ta[]king pictures of kids and families at the studio at Sears." (R. 261).

From 1998 until 2003, Lyons was employed as a "miscellaneous return clerk" at an agricultural products company. (R. 264). This was an office job that involved,

among other things, sorting mail and processing "books of tickets." (*Id.*). At the request of the ALJ, Lyons offered no further testimony regarding her employment history. (*Id.*).

In July 2003, Lyons had an operation to remove a tumor on her spinal cord. (R. 264). After the operation, she returned to work on a part-time basis. (R. 259-61). Lyons stated that she switched to part-time work due to fatigue. (R. 266). Because it took her "a long time" to go to sleep, Lyons was often tired, even while working part-time. (*Id.*). Generally, Lyons did not fall asleep until 2:00 or 3:00 in the morning, and then had to wake up for work at 6:00 or 7:00 a.m. (*Id.*). She claimed that she could not sleep because her "knees [we]re burning." (*Id.*).

Lyons stated that she did not work "very many" days in July 2003. (R. 261). She left work permanently on July 31, 2003. (*Id.*). Lyons recalled that Dr. Ann C. Winny ("Dr. Winny") suggested that she take "two or three months off" from work to "get [her] body together." (R. 267). Although Lyons intended to return to work, the following month she received a letter from her employer telling her "not to come back." (*Id.*). Lyons stated that she has not looked for a job since then because she's been busy "going to physical therapy, and . . . going back and forth to the doctor . . . [and] had shots in [her] back." (*Id.*).

Lyons testified that shortly after her employment ended she began receiving treatment for depression and fibromyalgia at Rush University Medical Center ("Rush"). (*Id.*). However, Lyons also testified that she discovered she had fibromyalgia at the end of 2004. (R. 271). According to Lyons, the health care providers at Rush recommended "water therapy" and informed her that she "needed the pool therapy for the rest of [her] life." (R. 268). Lyons described water therapy as "the only thing that

kind of alleviated and helped the muscles." (*Id.*).

Claimant stated that she "always took a lot of medications." (R. 265). Lyons has been on Prednisone since 2000, which she takes "pretty much for the [l]upus," although it is also prescribed for fibromyalgia. (R. 265, 268). According to Lyons, doctors generally "don't want to keep you on the Prednisone," but in her case "[i]t's something that can't be avoided because of the lupus." (R. 268). However, Lyons stated that she developed Type 2 diabetes from Prednisone. (R. 265). Claimant also testified that she takes Elavil for depression and fibromyalgia. (R. 268)

Lyons had two surgeries for boils. (R. 265). At the time of the hearing, Lyons had two boils which need to be lacerated. (*Id.*). Claimant stated that she has "boils, marks from boils all over [her] body" which are a side effect of her steroid medication. (R. 265-66). Lyons has "knots and stuff in [her] back from [a prior] back surgery." (R. 265). She "had a bulged disc" in her back, which she believed went undiscovered because her doctors "would just pump [her] up with more Prednisone and give [her] more pain pills." (R. 266). Lyons also has osteoarthritis in her knees and feet. (*Id.*).

Lyons testified that lupus "drains" her. (R. 265). She stated that she does not walk more than "a couple blocks" and cannot stand for "too long." (R. 269). If claimant stands for more than 15 or 20 minutes, the bottom of her feet "throb as if [she's] been standing for like 12 hours." (R. 270). As a result of the lupus, Lyons has "sun sensitivity and UV ray sensitivity" and must avoid the cold air since it causes her muscles to "cringe." (R. 265).

Lyons stated that she continues to experience fatigue and admitted to "dozing off" during the hearing. (R. 268). She believes her fatigue is caused by "lack of sleep at

night." (*Id.*). Generally, Lyons gets in bed around 9:00 or 10:00 p.m., and tosses and turns until 2:00 a.m. (R. 268-69). At night, Lyons feels something "burning up and down" her thighs, which she believes is related to her fibromyalgia. (R. 269).

Lyons testified that her fibromyalgia causes her to feel stiffness for up to two hours each morning, and "in the evening like when the dew falls." (R. 272). After the initial morning stiffness, the pain eases "some" and she is "all right for a little while." (*Id.*). Lyons takes two or three naps a day when she is "tired, really tired." (R. 268, 275). At the time of the hearing, Lyons felt "okay about two days out of a week," but otherwise didn't feel like she could leave the house. (R. 273). When asked if she was presently experiencing any pain, Lyons described "a dull burning ache" in her knees, particularly her left knee. (R. 269). Lyons also stated that her back was "a little sensitive" and she felt pain in her ankles. (*Id.*).

Lyons spends most days sitting in the house watching television, and only gets dressed once or twice per week. (R. 275). She cannot drive for more than 10 or 15 minutes because of "a gripping problem." (R. 258). According to claimant, lupus has affected her thumb joint, and she has a brace she wears "to do the gripping." (R. 266). She has difficulty grabbing pans or opening jars, and finds it "hard" to stir anything while cooking. (*Id.*). Claimant stated that her 12-year-old son helps with chores that require going outside, and her mother helps her cook and wash dishes. (R. 273-74). Lyons testified that she climbs "about 12" stairs to the basement to do laundry, but "the kids will come bring the stuff upstairs." (*Id.*).

Finally, Lyon testified that she "can't sit straight up" because it hurts her "upper back." (R. 270). She stated that she can sit in a recliner for "maybe an hour," but must

"get up and move a little bit because [her] joints . . . stiffen up." (*Id.*). Lyons can sit in a straight-backed chair for "maybe 30, 45 minutes" before needing to change positions. (R. 270-71).

### B. Medical Evidence

In support of her claim for disability, Lyons submitted medical documents from seven different medical professionals covering the time period from May 30, 2001 through February 20, 2006. (R. 168-235). Claimant also submitted a "Pre-Hearing Memorandum" prepared by her attorney. (R. 165-66). According to the memorandum, Lyons' first medical problem occurred when she underwent a laminectomy in October 1998 for "resection of a hemangioblastoma of her spinal cord." (R. 166). There is no evidence of a recurrence of the hemangioblastoma. (*Id.*). The memorandum further states that the claimant had arthroscopies of both knees in May and June of 2001 and underwent physical therapy in September to November 2004 for "fibromyalgia[] and back pain." (*Id.*).

Claimant made several visits to the Dreyer Medical Clinic ("Dreyer") in the summer of 2003. (R. 174-184). On July 11, 2003, Lyons saw urgent care physician Bharti Patel ("Dr. Patel"). (R. 181). Dr. Patel's progress notes indicate that Lyons complained of "chronic pain in the knees, left more than right" and had just completed physical therapy. (*Id.*). Dr. Patel recognized "no evidence of swelling" in the knee, and noted a "[r]eally unremarkable exam." (*Id.*). At that time, Lyons' medication included Darvocet, Prednisone and Nabumetone, which claimant characterized as "not helping." (*Id.*). Dr. Patel continued claimant's medication regime and discussed the exam with Dr. Winny, who recommended that claimant continue her physical therapy. (*Id.*).

The following week, on July 17, 2003, Lyons received treatment from John H. Lee, M.D. ("Dr. Lee"), in Dreyer's orthopedic department. (R. 176-77). Dr. Lee noted that Lyons' primary complaint was anterior left knee pain, she had difficulty with movement, used a walker, and denied any recent trauma. (R. 176). Claimant's medications included Prednisone, Imuran, Mabumetone and Flexetril. (R. 177). Dr. Lee opined that claimant's knee pain "is mainly from flare-up of synovitis which causes weakness of her quadriceps," and concluded that she is not a good surgical candidate. (*Id.*) He further noted that claimant "feels that when her quads are strong, her knee pain is less; however, when she has inflammatory flare-ups, she has pain. When her flare-ups go down, she has weakness and her symptoms become worse." (R. 176).

Also on July 17, 2003, John R. Tauscher, M.D. ("Dr. Tauscher") reviewed films of claimant's left knee. (R. 180). Dr. Tauscher noted "some spurring involving the insertion of the quadriceps tendon on the patella," which he characterized as "unchanged when compared to an exam dated May 1, 2001." (*Id.*). Dr. Tauscher found that claimant's left knee "is otherwise unremarkable." (*Id.*)

On July 25, 2003, six days before she permanently left work, claimant returned to Dr. Winny for further treatment. (R. 174-75). According to Dr. Winny's notes, claimant reported "severe left knee pain [and] lower back pain" and numbness in the lower extremities. (R. 174). Dr. Winny noted that claimant's lupus "has been under reasonably good control," but that she "still is limping and walking with difficulty." (*Id.*). She also noted that Lyons had tried Ultram and Vicodin for pain, but "nothing seems to help" since when Lyons "flares, it is very significant." (*Id.*).

Lyons complained of numbness in her left leg. (*Id.*). Dr. Winny observed that

claimant's left knee was "particularly" swollen, her left ankle was slightly swollen, and Lyons had a brace on. (R. 174). Claimant explained that her job required her to walk long distances, and Dr. Winny found this "may be aggravating the healing process in the knee." (*Id.*). Dr. Winny suggested Lyons take time off work "but the patient has no disability time left over." (R. 174-75). Accordingly, Dr. Winny recommended that claimant "minimize her walking and standing as much as possible for now" and continue working half days. (R. 175).

On October 17, 2003, Andem Ekpenyong, M.D. ("Dr. Ekpenyong"), an Internist at Rush, submitted a report to the Illinois Department of Human Services Office of Rehab Services. (R. 186-90). Dr. Ekpenyong reported that he last examined claimant on September 3, 2003, at which time he observed weakness in her left lower extremity. (R. 187). According to Dr. Ekpenyong, Lyons' complaints included pain, tenderness, and stiffness in her knees and back. (R. 187). He noted diagnoses of lupus, raynaud's syndrome, osteoarthritis, and a herniated disc, and noted that claimant underwent "resection of hemangioblastion" in October 2002 and arthroscopy of both knees in May and June 2001. (R. 187-88). Dr. Ekpenyong indicated that claimant had normal grip strength, no difficulties with her thumb and fingers, and no difficulties with grasping, turning, twisting or holding objects. (R. 187). He opined that Lyons could sit for three to four hours, stand or walk for 15 minutes at a time, and carry up 10 pounds. (R. 188).

On October 24, 2003, claimant visited Dr. John Ratliff ("Dr. Ratliff") for follow-up on her C7 to T2 laminectomy performed in October 1998. (R. 208-09). Dr. Ratliff reported Lyons' complaints of "burning and aching" down the anterior aspects of her thighs and "difficulty walking." (R. 208). He described the leg pain as "a new complaint

[that] has been present for only a few months." (*Id.*).  Claimant told Dr. Ratliff that these problems were "gradually worse." (*Id.*).  Dr. Ratliff observed that Lyons was alert and oriented, and in no acute distress.  (*Id.*).  He ordered a MRI of Lyons' cervical spine and thoracic spine.  (*Id.*).

On November 11, 2003, claimant had an internal medicine consultative examination for the Bureau of Disability Determination Services ("DDS").  (R. 210-13).  In connection with this examination, DDS physician Roopa Karri ("Dr. Karri") reviewed information provided by the DDS and spent 42 minutes with the claimant.  (R. 210).  According to Dr. Karri, claimant reported that she "has a lot of fatigue." (*Id.*).  Lyons characterized her fatigue as so "extreme" that she "[can] not drive to work." (*Id.*).  Dr. Karri observed that Lyons was falling asleep during the examination.  (*Id.*).  Claimant also reported that her knees and ankles were swollen, and that her left knee and ankle were more swollen than the right.  (*Id.*).  The claimant told Dr. Karri that medications "have been helping" but that "[s]he was told she may need surgery." (*Id.*).

Dr. Karri noted Lyons' history of steroid injections and lower back pain with herniated disks in the lumbar spine.  (*Id.*).  Claimant informed Dr. Karri that her left leg was still weak from the surgery she went through in 1998 to remove a spinal tumor.  (R. 211).  Lyons also reported that she drives very little, shops with a wheelchair, and uses a cane to walk long distances.  (*Id.*).  According to claimant, without the help of a cane, she could walk about one-half block.  (*Id.*).  She can normally handle objects, however "her hands have started shaking recently with Topamax." (*Id.*).

Dr. Karri classified the claimant as obese and observed that she could walk 50-feet without support, but was "limping in the left leg." (R. 212).  Dr. Karri also observed

that claimant was appropriate, polite, pleasant and cooperative; showed no signs of depression, agitation, irritability or anxiety; and that her hygiene and grooming were good. (*Id.*). Upon examination, Dr. Karri concluded that claimant had normal grip-strength and normal ability to grasp and manipulate objects. (*Id.*).

Based on the medical exam and review of medical records provided by the DDS, Dr. Karri found a history of "systemic lupus erthematosus causing joint pain in both knees and ankles with normal range of motion today." (R. 213). Dr. Karri concluded that claimant had lower back pain "with normal range of motion and negative straight leg raising test." (*Id.*). Dr. Karri also noted a history of steroid dependence secondary to lupus, and decreased sensations in the hands related to claimant's spinal cord surgery. (*Id.*). At the end of the examination, Lyons agreed that all her medical complaints had been addressed. (*Id.*).

Claimant returned to Dr. Ratliff on April 23, 2004 for a follow-up on her October 1998 laminectomy. (R. 206-07). Dr. Ratliff reviewed a MRI of claimant's lumbar spine and found it was negative, except for mild disc degeneration at the L4-5 level. (R. 206). Dr. Ratliff requested MRI's of claimant's cervical spine and thoracic spine. (*Id.*). These films showed a small area of encephalomealacia in the thoracic cord just posterior to the T1 vertebral body, which Dr. Ratliff characterized as "quite likely secondary to excision of the patient's hemangioblastoma." (*Id.*). Dr. Ratliff also obtained an EMG and nerve conduct study dated August 2003 from the University Pain Center at Oak Park. (*Id.*). After reviewing the study, he concluded that it was "normal." (R. 206). Along with a colleague, Dr. Ratliff repeated the study and concluded that the results were normal with no evidence of significant radiculopathy. (*Id.*).

Dr. Ratliff opined that Lyons had atypical bilateral lower extremity pain, the distribution of which was "not in keeping with a standard dermatome, nor with a lumbar disc herniation syndrome." (*Id.*). He also noted that "the distribution of this pain certainly is not [in] keeping . . . with the L5 radiculopathy that could be expected from the L4-5 disc degeneration, which is evident on Ms. Lyons' MRI." (*Id.*). Dr. Ratliff was "thoroughly underwhelmed with the severity of foraminal and central canal stenosis at this L4-5 level," and did not recommend surgery. (*Id.*). Instead, Dr. Ratliff recommended that Lyons follow-up with her pain clinic physician and consider following up with her rheumatologist. (*Id.*).

On September 29, 2004, physical therapist Julien Kwait ("PT Kwait") completed an initial evaluation of Lyons. (R. 232-34). PT Kwait noted claimant's diagnoses of fibromyalgia, chronic lower back pain and bilateral lower extremity muscle weakness. (R. 232). She further noted that claimant's medications included Prednisone, Topamax, Mobodic, Plaquenil, and Elavil. (*Id.*).

During the initial evaluation, Lyons complained of pain in her hips, legs, calves, and upper and mid back. (*Id.*). When asked to rate her pain on a scale of zero-to-ten, with ten being the most painful, Lyons answered that her pain was "from a 2-7." (*Id.*). Lyons reported chronic back and leg pain since her spinal surgery to remove a benign tumor in 1998, and increased knee pain since her arthroscopic knee surgery in 2001. (R. 232). Lyons stated that many months of physical therapy "did not help her knee, leg, or back pain." (*Id.*).

Claimant stated that she "is not working at this time due to her pain complaints." (*Id.*). Claimant also reported she was able to walk only one block, could only stand for

approximately 30 minutes, had trouble bending and lifting anything over 10 pounds, and had difficulty sleeping due to her pain. (*Id.*). She reported that her "goal in physical therapy is to be able to feel better so she is able to look for a job." (R. 232). PT Kwait set short term goals for claimant's physical therapy, including that Lyons tolerate 30 minutes of aquatic exercise and walk one block without an increase in symptoms. (R. 233). Claimant's long term goals included an increase strength by one-half grade and a decrease in pain complaints by 25%. (R. 234).

A progress note prepared by PT Kwait on November 11, 2004 states that claimant missed five physical therapy sessions, but still reported an increase in mobility and flexibility. (R. 235). Claimant also stated that her pain level had not changed. (*Id.*). However, PT Kwait observed that claimant was sometimes able to perform 30-45 minutes of aquatic exercises, depending on pain. (*Id.*). PT Kwait recommended Lyons continue her current physical therapy plan for two weeks, after which Lyons would be discharged to her attending physician. (*Id.*).

### C.    Claimant's Disability Report

The record includes a disability report, signed by Lyons, dated May 9, 2003. (R. 82-91). In the report, Lyons states that she suffers from lupus, arthritis, and back pain resulting from surgery. (R. 83). Lyons also reported that these ailments first bothered her on August 2, 2000, and have caused her to work fewer hours. (*Id.*). When asked to describe how her illness limits her ability to work, Lyons stated that her job "has no elevator" and her "doctor tells me to stay off my feet and limit walking and climbing stairs." (*Id.*). Lyons further stated that she is in pain four to five days a week, and also suffers from fever, fatigue, swollen ankles and knees, and difficulty walking. (*Id.*).

Finally, claimant stated that as a result of her condition she "has to have several days off . . . [and] might work 20-32 hours per week."  (R. 83).

In a separate portion of the report, Lyons stated that she suffers from "constant flares of both the arthritis and [lupus] which cause enormous pain in both legs, thighs, and ankles."  (R. 90).  According to claimant, the "two diseases cause extreme fatigue, but also the medication causes drowsiness, so [she] cannot drive to work."  (*Id.*).  Lyons added that she also suffers from "swelling on the spine with muscle spasms across [her] entire upper back and shoulders which is also painful and make it hard for [her] to sit up and write."  (*Id.*).

The record also includes Lyons' application for Prudential Group Disability Insurance and attached attending physicians' statement completed by Dr. Winny on or around April 30, 2001.  (R. 168-172).  In the statement, Dr. Winny reports that claimant is receiving ongoing treatment for systemic lupus and osteoarthritis.  (R. 171).  Dr. Winny opined that Lyons' condition is controlled with medication and is presently stable but "flareups intermittent[ly]."  (*Id.*).  She further noted that claimant was presently working, but "will need off intermittently for treatment."  (*Id.*).

### D.    Vocational Expert's Testimony

Vocational Expert Glee Ann Kehr ("VE Kehr") testified at the hearing.  (R. 276-80).  VE Kehr classified claimant's former position as a returned goods receiving clerk as medium in physical demand, semi-skilled in nature, and only transferable down to light.  (R. 277).  She opined that claimant's position as a security guard is also medium in physical demand, semi-skilled and not transferable below light.  (*Id.*).  VE Kehr classified claimant's former position as a photographer as "light, skilled, [and] not transferable to

sedentary." (*Id.*). Finally, VE Kehr classified claimant's former positions as a shoe salesperson, waitress, retail salesperson, and cook as light, semi-skilled, and not transferable. (*Id.*).

The ALJ asked VE Kehr what the vocational outlook would be for a hypothetical individual of the claimant's age with the same amount of education as claimant and the following functional limitations: has the ability to sit for six hours at a time and stand for six hours in an eight-hour day, can lift twenty pounds occasionally and ten pounds frequently, and can occasionally use stairs, but could never use ladders, stoop, kneel, crouch, or crawl. (R. 278). The VE opined that the hypothetical individual could perform a full range of light work, including all of claimant's past occupations with the exception of return goods clerk and security guard. (*Id.*). However, VE Kehr found the hypothetical individual could perform the claimant's former positions of returned goods clerk and security guard if they were transferred to light. (*Id.*). VE Kehr noted that the hypothetical individual would need to be able to get up for ten minutes, during which time she could continue working. (R. 278-79).

The VE opined that in the event the hypothetical individual couldn't perform claimant's past work, there are other available positions in the national and regional economy. (R. 279). VE Kehr testified that a person with the hypothetical individual's vocational functional limitations could perform the duties of a quotation clerk (3,000 positions in the Chicago metro area), account clerk (4,000 positions in the Chicago metro area) and order clerk (6,000 positions in the Chicago metro area). (*Id.*).

The claimant's attorney asked the VE what the vocational outlook would be if the hypothetical individual had all of the aforementioned limitations, but also required one

unscheduled 30-minute break from work activities due to fatigue. (R. 280). The VE concluded that the unscheduled break would "preclude all competitive employment." (*Id.*).

### III.    STANDARD OF REVIEW

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971)). In reviewing Lyons' claim, we must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). The Commissioner's decision will not stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

Although the ALJ "must build an accurate and logical bridge from the evidence to conclusions," he need not discuss every piece of evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Rather, the ALJ must "sufficiently articulate [his] assessment

of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## IV.    ANALYSIS UNDER THE SOCIAL SECURITY ACT

In order to receive disability benefits under the Social Security Act, a claimant must establish that she is disabled. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A). To determine if a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform [her] past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." 245 F.3d at 886.

ALJ Senander followed this five-step analysis. At step one, the ALJ found that Lyons had not engaged in substantial gainful activity since the alleged onset of her disability. (R. 19). At step two, the ALJ found that Lyons' combination of impairments,

16

specifically lupus, fibromyalgia, and back and knee pain, met the definition of severe for purposes of his analysis. (*Id.*). At step three, the ALJ determined that Lyons "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (*Id.*). Therefore, ALJ Senander moved on to step four to determine whether Lyons could perform her past relevant work.

ALJ Senander found Lyons' statements regarding the severity of her condition and related functional limitations were generally not credible. (R. 20). Specifically, he concluded that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Lyons' "statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." (R. 20). ALJ Senander also noted that "the claimant has, in fact, admitted certain abilities which provide support for part of the residual functional capacity conclusions," thereby implicitly discrediting claimant's statement that her condition precludes her from working. (*Id.*).

The ALJ found that Lyons has the residual functional capacity ("RFC") to perform a "somewhat restricted" range of sedentary work. (R. 19). He concluded that claimant "can sit for six hours and stand and/or walk for two hours during an eight hour work day in a job that permits her to stand up for a 10 minute interval after sitting for one hour." (R. 20). Accordingly, at step four, ALJ Senander determined that Lyons could not perform any of her past relevant work as a receiving goods clerk, security guard, photographer, retail salesperson, waitress and cook. (R. 21). However, based on claimant's residual functional capacity, the ALJ found at step five that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*).

17

Therefore, ALJ Senander concluded that Lyons is not disabled under the Act. (R. 22).

Lyons claims the ALJ's decision is in error. Specifically, claimant argues that the ALJ erred by: (1) ignoring medical evidence that contradicts his finding that Lyons has the RFC to perform a significant number of jobs; (2) failing to give appropriate weight to the opinion of Lyons' treating physician as to her functional limitations; and (3) failing to articulate the reasoning behind his credibility determination. We begin with ALJ Senander's consideration of claimant's RFC.

## V.    CLAIMANT'S OBJECTIONS

### A.    The ALJ's RFC Determination

A claimant's RFC is "the most the claimant can do in light of the alleged impairment and any related symptoms, including pain, which may cause physical and mental limitations that affect what the claimant can do in a work setting." 20 C.F.R. 404.1545(a). This function by function analysis must be performed before an ALJ can express a claimant's RFC in terms of the exertional levels of work, such as sedentary, light, or medium. Social Security Ruling ("SSR") 96-8p. The ALJ must consider all the medically determinable impairments, including those which are not severe. 20 C.F.R. 404.1545(b).

Lyons argues that the ALJ erred by neglecting to analyze the effects of claimant's fatigue before concluding that Lyons could perform a "somewhat restricted range of sedentary work." (R. 19); *see also* 20 C.F.R. § 404, Subpart P, Appendix 1 (identifying fatigue as a side effect of lupus). Claimant does not cite any evidence of fatigue in her motion, but merely asserts that she "is chronically fatigued and needs to nap." However,

a cursory review of the medical record reveals at least three reports of fatigue.  First, Dr. Karri noted Lyons' report of "a lot of fatigue," and observed that claimant was falling asleep during the examination. (R. 210).  Dr. Ekpenyong noted Lyons' report of "difficulty sleeping due to . . . pain."  (R. 232).  Finally, claimant stated in her disability report that she was so fatigued she could not drive to work.  (R. 90).   ALJ Senander erred by failing to explain the weight given to these opinions.  On remand, the ALJ must adequately discuss the limiting effects, if any, of claimant's fatigue.

To the extent claimant's motion asks this Court to find as a matter of law that her fatigue, need for alterative positions and periodic use of an assistive device precludes all employment, it is denied.  Claimant does not cite sufficient medical evidence to support this request.  Lyons primarily relies on VE Kehr's opinion that if fatigue required claimant to take one unscheduled 30-minute break from work each day, as proposed by her counsel, then claimant's fatigue would "preclude all competitive employment."  (R. 280). She also relies on the ALJ's failure to propose any hypotheticals involving claimant's postural limitations and occasional use of a cane and/or assisted device.[1]  (*Id.*). However, a hypothetical "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record."  *Moomey v. Apfel*, 1999 U.S. App. LEXIS 240, * 11 (Jan. 9, 1999) (*quoting Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994)).   In the event the ALJ finds the medical evidence shows that claimant does, in fact, require one unscheduled 30-minute break from work activities, then the ALJ must

---

[1]Portions of the exchange between ALJ Senander and VE Kehr are reported in the administrative record as "inaudible."  (R. 277-79).  Because this Court does not have a complete transcript, it is possible that the ALJ did, in fact, question the VE as to the alleged limitations.

consider VE Kehr's response to the hypothetical.  To the extent the ALJ finds the medical evidence supports any additional limitations, those must also be considered.

.    **B.    Lyons' Flare-Ups**

Next, claimant argues that the ALJ failed to give the appropriate weight to medical evidence concerning her flare-ups, and therefore did not properly consider her flare-ups in connection with his RFC assessment.  Claimant asks this Court to find as a matter of law that her flare-ups preclude all employment.  Specifically, claimant argues that "the very nature of [her] impairments [is] that she will have good days and bad days" and that her "flare-ups would be of such intensity and frequency so as to preclude the successful performance of substantial gainful activity."  Claimant does not cite any medical record that supports her characterization of the flare-ups.

ALJ Senander relied on Dr. Winny's report that claimant's "condition is stable between flares."  (R. 20).  However, Dr. Winny opined that when the claimant's maladies flare up, it is "very significant."  (R. 174).   Dr. Winny also urged Lyons to consider "taking off some time" due to her "flares."  (*Id.*).  This Court cannot determine if ALJ Senander considered Dr. Winny's findings regarding claimant's flare-ups.  *See, e.g. Clifford,* 227 F.3d at 870 (ALJ must minimally articulate his reasons for rejecting this evidence); *Garcia v. Califano,* 463 F. Supp. 1098, 1105 (N.D. Ill. 1979) (while the ALJ need not discuss every piece of evidence, he cannot ignore evidence contrary to his conclusions). On remand, the ALJ should assess the effects of the flare-ups on Lyons' RFC.

**C.    Lyons' Credibility**

Finally, Lyons contends that the ALJ erred in rejecting her credibility.  To succeed

on this ground, claimant must overcome the highly deferential standard that we accord credibility determinations. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that the credibility determinations of hearing officers are afforded special deference). Because the ALJ is in a superior position to assess the credibility of a witness, we will reverse an ALJ's credibility determination only if claimant can show that it was "patently wrong." 207 F.3d at 435.

ALJ Senander found that "[a]fter considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." (R. 20). The ALJ further found that Lyons' complaints of "burning and aching in both thighs" were not credible because they were contradicted by two EMG/NCV studies. (*Id.*). Finally, the ALJ found that Lyons' statements regarding the frequency and length of her "intense episodes of pain" were not convincing. (R. 21).

Lyons contends that the ALJ "failed to make any credibility determination at all" and "simply stated that the claimant's allegations were not entirely credible." This characterization ignores ALJ Senander's specific findings regarding Lyons' complaints of thigh pain, as well as his review of claimant's testimony regarding her functional abilities. (R. 20). Lyons further argues that the ALJ failed to comply with the requirements of SSR 96-7p which provides that an ALJ's "assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on [her] ability to function must be based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings." SSR 96-7p; *see also Giles v.*

21

*Astrue*, 483 F.3d 483, 488 (7th Cir. 2007). Lyons claims that "the record shows that [she] has tried numerous medications, some causing significant side effects, all without adequate relief." (R. 179, 177, 181, 202). The record citations identified in claimant's brief do not support her allegations regarding the "significant side effects" of her medication regime. In fact, claimant has not identified any "medical signs and laboratory findings" that directly contradict ALJ Senander's credibility determination. Therefore, we do not find, as a matter of law, that the ALJ made the wrong choice in discrediting claimant's testimony regarding the intensity, duration and limiting effects of her symptoms. *See Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002) (rejecting claimant's contention that the ALJ improperly discounted his allegations of back pain on the grounds that "the resolution of competing arguments based on the record is for the ALJ, not the court.")

The Commissioner argues that ALJ Senander actually accepted many of claimant's purported limitations, as demonstrated by his RFC assessment; properly considered the relevant credibility factors, including the consistency between claimant's allegations and the medical opinion evidence; and "adequately explained why he did not find [Lyons] fully credible." However, the Commissioner relies on certain opinions contained in the medical record that are not included in ALJ Senander's analysis. Among other things, the Commissioner asks this Court to consider Dr. Ratliff's finding that he was "thoroughly underwhelmed with the severity" of claimant's bilateral lower extremity pain. (R. 206). Had the ALJ included Dr. Ratliff's opinion, as well as the other medical records cited in the Commissioner's brief, in his analysis, this Court would be inclined to uphold his credibility determination.

22

With the exception of Lyons' complaints of thigh pain, we find that ALJ Senander did not articulate his opinion regarding claimant's credibility in a manner that allows this Court to "track the ALJ's reasoning and be assured that the ALJ considered the important evidence" in connection with his credibility determination. *Diaz*, 55 F.3d at 308 (*quoting Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995)). On remand, the ALJ must articulate the rational behind his credibility determination, including without limitations his findings regarding Lyons' characterization of her pain, fatigue, and the side effects of her medication.

## VI.    CONCLUSION

For the reasons set forth above, Lyons' motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied. The case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTERED:**

_____

**MICHAEL T. MASON**
**United States Magistrate Judge**

**DATED: April 29, 2009**